ENDANGERED SPECIES COMMITTEE OF the BUILDING INDUSTRY ASSOCIATION OF SOUTHERN CALIFORNIA, et al., Plaintiffs,

v.

Bruce BABBITT, Secretary of the Department of Interior, et al., Defendants.

Civ. No. 92–2610 (SS).

United States District Court, District of Columbia.

May 2, 1994.

As Amended on Motion to Reconsider June 16, 1994.

James M. Picozzi, Nossaman, Guthner, Knox & Elliott, Irvine, CA, Endangered Species Committee of the Bldg. Industry Ass'n of Southern California.

James M. Picozzi, Robert D. Thornton, Nossaman, Guthner, Knox & Elliott, Irvine, CA, for Foothill/Eastern Transp. Corridor Agency, San Joaquin Hills Transp. Corridor Agency.

Christiana P. Perry, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for defendants.

### MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

Plaintiffs here seek review of the Secretary of the Interior's final rule, 58 Fed.Reg. 16,742, listing the coastal California Gnatcatcher (*Polioptila californica californica*) (P.c.c.) as a threatened species under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* Parties have filed cross motions for summary judgment.

### I.  *FACTUAL BACKGROUND*

This case involves a species of bird known as the California gnatcatcher (*Polioptila californica*) and a subspecies of that bird known as the coastal California gnatcatcher (*Polioptila californica californica*) (*P.c.c.*). At issue is whether the defendant United States Department of the Interior acted arbitrarily and capriciously, or contrary to law in listing the *P.c.c.* as threatened under the Endangered Species Act (ESA), 16 U.S.C. § 1533 *et seq.* 5 U.S.C. § 706 *et seq.*

At the center of the dispute are two papers by Dr. Jonathan Atwood, an ornithologist with the Manomet Bird Observatory, one written in 1988 and a second written in 1990. These reports were based on the same data, but resulted in different conclusions. Jonathan L. Atwood, *Status Review of the California Gnatcatcher* app. I at 50 (1990). Before publishing the 1988 paper, Atwood spent several years studying 189 male California gnatcatchers comparing various morphological characteristics such as the size of bills, length of tails and toes, and brightness and purity of plumage. *Id.* at 51–52. The specimens were separated into nine sample areas along a latitudinal gradient stretching from southern California to the tip of Baja California. *Id.* at 51. Comparing the samples along the gradient, Atwood looked for the occurrence of a pronounced "step" in morphological characteristics, which would indicate the break between two species or subspecies. *Id.* at 52.

Dr. Atwood's 1988 paper identified the California Gnatcatcher as a new species, distinct from the black-tailed gnatcatcher (*Polioptila melanura*) which is found in large portions of Mexico and the western United States. *Administrative Record for Listing of the Coastal California Gnatcatcher* (A.R.), Vol. I, Doc. 39, at 829. (I:39:829). The paper further concluded that within the California Gnatcatcher species existed two subspecies: a northern subspecies known as the coastal California Gnatcatcher (*P.c.c.*), and a southern subspecies known as the *Polioptila californica margaritae*. *Id.* at 863.

Neither of these findings has been disputed. However, within the 1988 paper, Atwood concluded that the *P.c.c.* subspecies exists in a geographic range from southern California to 25 degrees North latitude in southern Baja California, Mexico. This conclusion was

contrary to the historical belief that the coastal California Gnatcatcher existed only as far South as the 30 degrees North latitude line. The paper was peer-reviewed and this latter portion of the study came under considerable criticism. Def. Motion for Summary Judgment at 7. Criticism of the 1988 report came from ornithologists on both sides of this case. As a result of the criticism, Atwood reanalyzed his data and wrote a second paper in 1990. In the 1990 paper Atwood concluded that his 1988 conclusions regarding *P.c.c.*'s range had been incorrect. He revised the southern range limit of the *P.c.c.* at 30 degrees North latitude, in northwestern Baja California, Mexico, five degrees further north than his 1988 paper had indicated.

It was vital in deciding whether the *P.c.c.* is threatened to locate the subspecies' southernmost limit. If the members of the gnatcatcher species existing as far south as 25 degrees North latitude were considered to be of the *P.c.c.* subspecies, then the bird likely existed in large enough numbers to stay off of the threatened list. Conversely, if the *P.c.c.* only existed as far south as 30 degree North latitude, then under the terms of the ESA, it could be considered threatened. Central to this case therefore, is whether the defendant acted arbitrarily and capriciously or contrary to law in deciding that the southernmost limit is 30 degrees North Latitude.

*Procedural History of the Rulemaking*

On September 21, 1990, the Fish and Wildlife Service received two petitions requesting that it list the *P.c.c.* as threatened species. On December 17, 1990, a third petition for the same action was received from Dr. Atwood, representing the Manomet Bird Observatory and the National Resources Defense Council. The petition included Dr. Atwood's 1990 report which found the southern range limit of the *P.c.c.* to be 30 degrees North latitude.

On January 24, 1991, the Service found that the petitioners presented substantial information indicating that the petitioned action may be warranted. 56 Fed.Reg. 12146 (Mar. 22, 1991). On September 17, 1991, the Service issued a proposed rule listing the *P.c.c.* as threatened throughout southern Cal-

ifornia and northwestern Baja California, Mexico. 56 Fed.Reg. 47053 (Sept. 17, 1991). The Service considered several factors in determining that the *P.c.c.* should be listed as threatened. The primary factor was its conclusion that there was a present and threatened loss and fragmentation of gnatcatcher habitat occurring in conjunction with urban and agricultural development. *Id.* at 47055–56. In reaching this conclusion, the service relied on information contained in the three petitions, including Atwood's 1990 report.

As required by statute, the Service announced a six-month period in which interested parties and the public could comment on the proposed rule. During that period, the Service received comments questioning the "scientific validity" of Atwood's 1990 study, in light of the fact that he had analyzed the identical raw data in 1988 and 1990, and had come to different conclusions.

Some of those questions came from the plaintiffs, who submitted papers by Dr. George Barrowclough, Chairman of the Department of Ornithology of the American Museum of Natural History, and Dr. Lyman McDonald, a biostatistician. Both concluded that it was not possible to determine whether Atwood was correct in 1988 or 1990 without access to his raw data. A.R. II:615:4517–18, 4529–39. The papers also criticized Atwood's statistical presentation and analysis, and identified errors and inconsistencies in the 1990 Report.

Plaintiffs made requests to the Secretary for Atwood's raw data. Since the Secretary had not reviewed the raw data in making his determination, he denied plaintiffs' requests. Plaintiffs also sought access to the data directly from Dr. Atwood himself. Atwood refused, claiming plaintiffs' expert consultants been hired to help the building industry in "some sort of statistical 'witch hunt.'" AR I:61:7707; II:540:3438. He did offer to give the data to the Service or to any member of the American Ornithologists' Union (AOU) "checklist committee", but this never occurred.

Partly in response to criticism from the plaintiffs, the Service extended the deadline for the final rule, pursuant to Section

4(b)(6)(B)(i) of the ESA, for a period of six months, or until March 17, 1993. A.R. I:438:5795; 57 Fed.Reg. 43686 (Sept. 22, 1992). In addition, the Service formally asked the AOU, through its Committee on Classification and Nomenclature (CCN),[1] to carry out a taxonomic study[2] of the *P.c.c.* A.R. I:609:7432. In the Service's Notice of Six Month Extension, it announced that it had asked the AOU for its position, and that it would receive comments from the public regarding the issue for a period of thirty days. A.R. I:438:5795.

### The Findings of the AOU Committee on Classification and Nomenclature

On September 24, 1992, AOU/CCN chairman Burt Monroe, Jr. responded to the Service's request. He stated that the CCN would not be formally evaluating the gnatcatcher subspecies for several years. The official position of the committee on the issue of the scientific validity of the taxon *P.c.c.*, however, was to recognize it. A.R. I:608:7430. According to Monroe, several members of the Committee had looked at the issue specifically and examined the relevant literature of the subject. *Id.* Furthermore, all of the CCN members reviewed Atwood's papers and several had personally inspected specimen material. *Id.*

Monroe also cited a July 15, 1991 critique of Atwood's second report by AOU member Dr. John Fitzpatrick. Fitzpatrick had found that the 1990 paper was "thorough and excellent, including his open discussion of why his previous comments on intraspecific variation were in error." A.R. I:605:7420–21. Fitzpatrick had described the mistake in Atwood's 1988 study as being based on the misapplication of certain procedures used to distinguish between subspecies. *Id.* Fitzpatrick found that this resulted in an erroneous conclusion about the range of the subspecies *P.c.c.*

As well as supporting Atwood's specific bases for recognizing a subspecific distinction, Fitzpatrick noted congruent patterns in geographic variation among species at the 30 degrees North latitude line. The 30 degree line also represented the southernmost limit for the coastal sage scrub upon which the gnatcatcher depends, and for several other plants and species, including birds, reptiles and scorpions. *Id.* Finally, Fitzpatrick noted that the subspecies *P.c.c.* has been recognized as existing in this area since 1957. *Id.*

### The Service's Internal Review

In addition to the public comment process, the Service conducted its own internal review of the issue. The service requested that its own taxonomists, Drs. Richard C. Banks and Alfred L. Gardner, examine the issue of taxonomy in general, and Dr. Atwood's study in particular. A.R. I:051:1075–1094; I:760. The Banks and Gardner Report was completed on December 17, 1992, and contained three parts. The first part reviewed the taxonomic history of the species Polioptila californica, concentrating on the area occupied by *P.c.c.* The second part critiqued the 1990 Atwood paper. The third part responded to specific issues raised by the plaintiffs in their comments, including their stated need to evaluate Atwood's raw data.

On January 21, 1993, the Service sent plaintiffs a copy of the Banks and Gardner report. A.R. I:754–757. On February 11, 1993, the Service published a Notice of Availability of the Banks and Gardner Report in the *Federal Register* and reopened the public comment period for twenty days. A.R. I:439; 58 Fed.Reg. 8032 (Feb. 11, 1993).

### The Final Rule

On March 25, 1993, the Service listed the coastal California gnatcatcher as a threatened species. A.R. I:440:5799–5815. The final rule summarizes the procedural history of the rulemaking, both prior to the Service's decision to propose the gnatcatcher for listing as threatened, and subsequent to that time. The final rule states that a total of 770 comments were received after the Service proposed to list the gnatcatcher, but prior to

---

1. According to the defendant, the CCN is the nation's leading authority on avian taxonomy. Defendant's motion for summary judgment at 10.

2. Taxonomy is defined as the "orderly classification of plants and animals according to their presumed natural relationships." Webster's Ninth New Collegiate Dictionary 1209 (1985).

the final decision. A.R. I:440:5802. It further explains that the Service reviewed all comments received, including those that were received outside the formal comment period.

Based on a review of the comments submitted to it, the Service identified twenty issues in the final rule that were raised by the comments opposing the listing and relevant to the listing determination. Included among these were the taxonomy of *P.c.c.* and the validity of the statistical analysis used by Dr. Atwood in his 1990 paper. *Id.* The Service cited numerous reasons for its determination that the *P.c.c.* existed as a separate subspecies north of the 30 degrees North Latitude. First, it explained that Atwood's conclusion that the California gnatcatcher is a separate species from the *P.c.c.* had been universally accepted and had been based on ecological and behavioral differences between the two species, and confirmed by the lack of interbreeding between the two. *Id.* Second, prior to any of Atwood's studies there had been widespread and long-standing recognition among the ornithological community of the existence of a distinct subspecies of gnatcatcher in southwestern California and northwestern baja California, Mexico. *Id.* Finally, the Service explained that its own examination of the issue concluded that the gnatcatcher was a valid taxon whose range extends to about 30 degrees North latitude in Baja California, Mexico. *Id.*

With regard to the comments questioning the validity of the statistical analysis used by Atwood to evaluate morphological variation within the California gnatcatcher (*P.c.*), the Service concluded that Atwood's methods are "well within the norm for systemic/taxonomic reviews of geographic variation in birds." A.R. 1:440:5803. This conclusion was based on both a review of those methods by Atwood's peers, and an evaluation of those methods by the Service.

## II. *DISCUSSION*

■ Plaintiffs challenge several aspects of the rulemaking process, including the failure to provide or consider Dr. Atwood's raw data, bias on the part of the Secretary, and failure to meet certain procedural requirements of the APA and ESA.

■ Judicial review of agency action under the Endangered Species Act is pursuant to the Administrative Procedure Act, 5 U.S.C. § 706. See *City of Las Vegas v. Lujan,* 891 F.2d 927, 932 (D.C.Cir.1989). Under the APA, this court may set aside the actions of the Federal defendants only if they are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential.... [and] presumes agency action to be valid." *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir.) (en banc), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Pacific States Box & Basket Co. v. White,* 296 U.S. 176, 185–86, 56 S.Ct. 159, 163–64, 80 L.Ed. 138; *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)). This does not mean that this court should "rubber-stamp the agency decision." *Ethyl Corp.,* 541 F.2d at 34. This is particularly true when the case is highly technical. *Id.* at 35.

> [a] court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent.

*Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

■ Plaintiffs correctly cite this and other Circuits for the proposition that where an agency relies upon data to come to a rulemaking decision, it generally has an obligation under the APA to provide such data for public inspection. Pl. Motion for Summary Judgment at 37 (citing *Sierra Club v. Costle,* 657 F.2d 298, 334 (D.C.Cir.1981) (agency must provide for "public exposure ... the assumptions and data incorporated

into the analysis...."); *Chemical Mfrs. Ass'n v. Environmental Protection Agency,* 870 F.2d 177, 200 (5th Cir.1989) ("fairness requires that the agency afford interested parties an opportunity to challenge the underlying factual data relied on by the agency"); *United States v. Nova Scotia Food Prods. Corp.,* 568 F.2d 240, 252 (2d Cir.1977) ("[t]o suppress meaningful comment by failure to disclose the basic data relied upon is akin to rejecting comment altogether"); *Idaho Farm Bureau v. Babbitt,* 839 F.Supp. 739 (D.Idaho 1993) ("[o]ne cannot ask for comment on a scientific paper without allowing participants to read the paper"). In this case the Secretary claims to have fulfilled his legal obligation. Since he did not rely on Atwood's raw data as such, he submits he was not required to provide it for public inspection. This begs the question at issue. The Secretary admits he relied on Atwood's report, which report it is assumed was based on the raw data to which plaintiff now seeks access.

■ The ESA requires the Secretary to make determinations "solely on the basis of the best scientific and commercial data available to him...." As illustrated by both parties' briefs, data can come in many forms: it can be a scientific report; it can be the graphs and tabulations appearing in a scientific report; it can be the raw numbers used to create the graphs and tabulations; or it can be the actual samples themselves—in this case, gnatcatcher specimens. While courts have generally allowed agencies to rely on scientific reports, *see Idaho Farm Bureau v. Babbitt,* 839 F.Supp. 739 (D.Idaho 1993), this is not sufficient in this case because the report itself is under serious question.

In this case, the Secretary decided that analysis of the summary report fulfilled his requirement under the Act. He came to this conclusion after commissioning internal and external reviews of the Atwood report. Among the conclusions of those reviews was the AOU's statement that within the scientific community, an ornithologist is not usually required to provide his underlying raw data to support a scientific paper. While this may be generally true within the ornithological community, it is not the test for this proceeding.

While it is not disputed that Atwood's means of collecting data were proper, *see* Declaration of George F. Barrowclough in Support of Motion for Preliminary Injunction 2 (reproduced at AR II:615:4514) (admitting that Atwood relied on "what appears to be first-rate raw data"), his means of analysis have come under serious question. The Secretary had before him a report by an author, who two years before had analyzed the same data and had come to an opposite conclusion. It is the disputed nature of this report that distinguishes this from other cases where a scientific report alone has been considered sufficient for ESA purposes. Where, as in this case, the underlying data from such a critical and disputed report is readily available to the Secretary, even though he chose not to review the data, it was error for the Secretary not to make the data available to those interested parties from whom the Secretary sought comment. These parties, by not having the data underlying the report, were deprived of important and material information from which they could make meaningful analysis in order to provide their views to the Secretary.[3]

Plaintiff makes two other claims: that the Secretary acted with bias, and that he failed to meet certain procedural requirements of the APA and ESA. On the whole, the Court finds these claims to be without merit. Plaintiff does point out, however, that Dr. Banks, who reviewed the Atwood paper for the Secretary, had previously provided editorial advice to Atwood on that same paper. While there is no indication that Banks was biased in his work for the Secretary, the Court suggests that in analyzing Atwood's report and accompanying data, the Secretary should avoid any appearance of conflict of interest by assigning a different scientist to the task.

---

**3.** This is the very procedure that is used by triers of fact when considering summary testimony by experts. *Cf.* Fed.R.Evid. 705.

*Conclusion*

Because the Secretary should have made available the underlying data that formed the basis of the Atwood report, the decision to list the gnatcatcher as a threatened species violated the Administrative Procedures Act. The decision of the Secretary will be vacated and the matter remanded. An appropriate order accompanies this opinion.

## *ORDER*

Having considered the defendant's motion for summary judgment and plaintiffs' cross-motion for summary judgment, heard argument by the parties, and reviewed the administrative record, for the reasons stated in the foregoing memorandum opinion it is hereby

**ORDERED** that defendant's motion for summary judgment is denied; and it is further

**ORDERED** that plaintiffs' cross-motion for summary judgment is granted; and it is further

**ORDERED** that the decision of the Secretary to list the species in question as threatened is vacated; and it is further

**ORDERED** that this matter is remanded to the Secretary for further proceedings not inconsistent with this opinion.

Defendants have asked the Court to reconsider or in the alternative to amend its judgment of May 2, 1994. The Court has considered the motion, plaintiffs opposition thereto, and heard argument by the parties. For the following reasons, the Court will amend its judgment.

### 1. Background

Plaintiffs filed this case seeking review under the Administrative Procedure Act of the Secretary of the Interior's final rule, 58 Fed.Reg. 16,742, listing the songbird subspecies coastal California Gnatcatcher (*Polioptila californica californica*) (*P.c.c.*) as a threatened species pursuant to the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* The parties filed cross motions for summary judgment. The Court heard argument on the motions on March 25, 1994. On May 2, 1994, the Court granted summary judgment

for the plaintiffs and ordered that the Secretary's decision to list the *P.c.c.* be vacated.

As described in the May 2, 1994 memorandum opinion, a fundamental dispute in this case centers around two papers, one from 1988 and a second from 1990, by an ornithologist with the Manomet Bird Observatory, Dr. Jonathan Atwood. Atwood in his two papers came to inconsistent conclusions about the *P.c.c.'s* southern range limit. The southern range of the tiny songbird is significant. The more southerly the range of the *P.c.c.* subspecies of the gnatcatcher, the greater the percentage of all gnatcatchers in California and Mexico that should be categorized as *P.c.c.*, and the less likely it is that the *P.c.c.* subspecies of the bird should be considered threatened.

Before publishing his first paper in 1988, Dr. Atwood had spent several years studying gnatcatcher specimens and tabulating the birds' various morphological characteristics. In his initial paper, Dr. Atwood analyzed his data and concluded, *inter alia,* that the *P.c.c.* subspecies of gnatcatcher exists in a geographic range from southern California down to 25 degrees North latitude in southern Baja California, Mexico. This particular conclusion of the 1988 report came under considerable criticism from Dr. Atwood's peers in the ornithological community. On the basis of this criticism, Dr. Atwood reanalyzed the *same* raw data of gnatcatcher characteristics and wrote a second report in 1990. In the second report, Atwood revised the southern range limit of the *P.c.c.* to be 30 degrees North latitude. Although the second report contained summary graphs and charts, it did not include Atwood's raw data—his specimen specific individual gnatcatcher measurements.

On January 24, 1991 the Fish and Wildlife Service of the Department of the Interior issued a proposed rule listing *P.c.c.* as threatened. The Service relied on information contained in Atwood's 1990 report in coming to its conclusion. During the period for comment on the proposed rule, the plaintiffs submitted papers by two experts, Dr. George Barrowclough, chairman of the Department of Ornithology of the American Museum of Natural History, and Dr. Lyman McDonald,

a biostatistician. Both experts in their submissions concluded that it was not possible to determine whether Atwood was correct in 1988 or in 1990 without having access to the raw gnatcatcher measurements.

The Plaintiffs made numerous requests to the Secretary for access to the raw data used in Atwood's two papers. The Secretary stated that he relied on the Atwood Report and not on Atwood's underlying data. In fact, the Secretary reported he did not have the requested data, and thus was incapable of providing it. Dr. Atwood, too, was approached directly by plaintiffs for access to his raw data. The plaintiffs were unsuccessful in obtaining the information from Atwood despite plaintiffs repeated requests.

Plaintiffs' argument in their motion for summary judgment related to Atwood's contradictory conclusions and plaintiffs' inability to properly evaluate those conclusions without access to the underlying data. At the hearing on plaintiffs' motion, oral argument focused substantially on this question.[1] The Court considered the arguments of counsel and found, pursuant to the Administrative Procedure Act, that the Secretary should have made Atwood's raw data available to interested parties. *See* Memorandum Opinion of May 2, 1994 at 13–14. The Court's decision to grant plaintiffs' motion for summary judgment was based squarely on this issue.

**1.** The transcript of the March 25, 1994 summary judgment hearing makes it clear that Atwood's raw data, and plaintiffs' lack of access thereto, were the central focus of plaintiffs' challenge to the Secretary's decision:

*See* Transcript at 7–8:
Mr. Falk: The objections here are procedural, your honor. We know that the Secretary ultimately has the call on the ultimate fact. The procedural issues that
I want to focus on this morning ... are, number one, the failure of the Secretary to obtain and make a part of the administrative record and to consider the underlying data on which Dr. Atwood's reports, which is the linchpin of the whole thing, the underlying data on which the report was based.

Transcript at 16:
Mr. Falk: But the Secretary never requested Atwood for that data, and had never placed it in the administrative record or considered it. And has never answered the questions raised

## II. The Instant Motion

### a. Motion to Reconsider

On May 16, 1994, the federal defendants moved for reconsideration or in the alternative for an amendment of the Court's May 2, 1994 judgment. In their motion to reconsider, the federal defendants argue that since the Secretary did not have Atwood's raw data, he was under no legal obligation to turn over what he did not have. The Court rejected this argument when it was originally made and will reject it again at this time. The record demonstrates that the information was at all times available to the Secretary and clearly would have been provided had the Secretary chosen to ask for it. Where a reputable scientist has come to two inconsistent conclusions after analyzing one data set, and the Secretary relies on one of these contradictory conclusions, the interested parties should be allowed access to the underlying data.

Further, the Court points out that if Dr. Atwood had denied the Secretary access to his data, such refusal would have been grounds for vacating the Secretary's decision. There could hardly be any greater abuse of discretion for an adjudicating official to rely on a report where the underlying data has been denied to that official.

### b. Motion to Amend the Judgment

Federal defendants move in the alternative for an amendment of this Court's

by the scientists.... And that's the problem. If you had the data, you could make—you could make a judgment, an intelligent and correct judgment as to whether Atwood has reached the wrong conclusion or the right one.
Transcript at 37–38
Mr. Flynn: Dr. McDonald and Dr. Barrowclough are simply saying that they cannot tell whether the conclusions that were reached by Dr. Atwood are justified, because they have not had an opportunity to review the data.

.     .     .     .     .

If someone came into this Court, for example, in a conventional trial proceeding, and said to the Court, "I am an expert, I would like the Court to believe me about my conclusions about the gnatcatcher." Does anybody doubt that those who have an interest in that opinion and in the outcome of that opinion would have the right to see the data upon which he bases his conclusions?

judgment of May 2, 1994. The Secretary has now agreed to obtain the data in question and make it available. Defendants propose that the Court permit the retention of the *P.c.c.* on the threatened species list while the Secretary makes Atwood's data available for public comment via publication in the Federal Register.[2] The Secretary will then complete a review of the data and all comments submitted thereon and will make a final determination within 100 days after the publication in the Federal Register.

In support of their request for an amendment of this Court's judgment, defendants have submitted an affidavit by Mollie Beattie, Director of the United States Fish and Wildlife Service. Director Beattie's declaration places the listing of *P.c.c.* in a broader context. According to Director Beattie, the listing of the *P.c.c.* provides the regulatory underpinning for an innovative statutory program enacted by the State of California. In 1991, the State of California enacted the Natural Community Conservation Planning Act of 1991, Cal.Fish & Game Code §§ 2800 *et seq.* (N.C.C.P. Act). The purpose of the N.C.C.P. Act is to identify and provide for the regional protection and perpetuation of wildlife diversity, while allowing compatible and appropriate development and growth. The California Department of Fish and Game identified the coastal sage scrub natural community as a pilot conservation planning effort under the N.C.C.P. Act. Beattie Decl. ¶ 6. The coastal sage scrub is the *P.c.c.'s* natural habitat.

To implement the N.C.C.P. coastal sage scrub planning effort, local jurisdictions and private landowners were encouraged to voluntarily "enroll" in the N.C.C.P. by committing to protect coastal sage scrub areas under their control, pending completion of a regional N.C.C.P. plan that would provide permanent protection of coastal sage scrub habitat. Prior to listing of the *P.c.c.*, many jurisdictions and landowners with control over *P.c.c.* habitat elected not to enroll in the program. Beattie Decl. ¶ 8. According to Director Beattie, absent the legal protection afforded through the listing of the *P.c.c.*, habitat loss and fragmentation can continue to occur prior to development and implementation of adequate conservation plans under the N.C.C.P. For example, between August of 1991 and March 30, 1993, over 4,600 acres of coastal sage scrub was destroyed within the *P.c.c.'s* range in Orange, Riverside, and San Diego Counties. Beattie Decl. ¶ 10.

The listing of the *P.c.c.* provides incentives for the voluntary enrollment of landowners in the N.C.C.P. program. On December 10, 1993, the Service published a final special rule for *P.c.c.* under Section 4(d) of the Endangered Species Act. Under the final special rule, "take" of the *P.c.c.* is not considered a violation of Section 9 of the Endangered Species Act, if the Service determines that the N.C.C.P. plan meets the criteria for issuance of an "incidental take" permit. Through the 4(d) rule, the *P.c.c.* listing supports and provides a regulatory foundation under the Endangered Species Act for the N.C.C.P.'s efforts to protect the gnatcatcher and other coastal sage scrub dependent species on an ecosystem scale. To this end, the final special rule offers tangible incentives to encourage participation in and development and implementation of N.C.C.P. plans. Beattie Decl. ¶¶ 13–14. According to Director Beattie, without listing of the *P.c.c.*, the framework of incentives and compromise on which the N.C.C.P. is based is imperiled. Beattie Decl. ¶ 15.[3]

---

2. This option is available to the Secretary because on May 5, 1994, Dr. Atwood wrote Secretary Babbitt offering the disputed raw data for examination:

> [V]ia this letter I wish to communicate to you that I have decided to provide my raw morphological measurements of *Polioptila californica* to any representative of the Fish and Wildlife Service whom you may choose to designate as a recipient. I willingly take this action in the spirit of scientific cooperation and a desire to assist the Service in making an

objective and responsible decision with regard to the gnatcatcher issue.

Federal defendants' Reply Memorandum, Exhibit 1, Letter of Jonathan L. Atwood, Ph.D. May 5, 1994.

3. None of the facts which relate the listing of the *P.c.c.* to the California N.C.C.P. Act were detailed in the original summary judgment papers or mentioned by either of the parties at the summary judgment hearing. A court cannot decide a case in a vacuum. The administrative record in this case approaches 10,000 pages in length.

The Service has reason to believe that removal of the species from the threatened list, even for a short period while the Secretary reassesses his decision in light of any new comments being received on the Atwood data, could irreparably harm remaining coastal sage scrub habitat communities by spurring accelerated destruction of that habitat. Landowners may take advantage of what may be their only window of opportunity by plowing under coastal sage scrub on their land. Without the bird being listed, there is nothing to prevent this from occurring. As support for the likelihood of this possibility, Director Beattie cites a report in the *Wall Street Journal,* where counsel for plaintiffs in this case was quoted as saying, "A lot of landowners will look seriously at clearing their land of coastal sage brush to rid themselves of this problem." Charles McKay, *Citing Regulatory Errors Judge Orders Songbird Off Endangered Species List,* Wall St. J., May 3, 1994 at B5. Beattie Decl. ¶ 16.

Plaintiffs rebut the factual assertions of Director Beattie with the declarations of Boyd Gibbons, Director of the California Department of Fish and Game, and that of Thomas Matthews, Director of Planning for the County of Orange. Those declarations confirm the importance of the N.C.C.P. Act and attest to the fact that local jurisdictions and many landowners are participating in the N.C.C.P. voluntarily and much of the coastal sage scrub habitat remaining is protected under state and local provisions, without the additional protection of federal listing of the *P.c.c.*.

## III. Decision

■ The Court believes that the appropriate approach would be to permit the Secretary to continue the listing of the *P.c.c.* while he takes steps to rectify the procedural flaw in the original listing process. The usual remedy for a procedural violation of the A.P.A. is to set the regulation aside. *Chrysler Corp. v. Brown,* 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979). However, in unusual circumstances "an unlawfully promulgated regulation can be left in place while an agency provides the proper procedural remedy." *Fertilizer Institute v. United States Environmental Protection Agency,* 935 F.2d 1303, 1312 (D.C.Cir.1991); *Chemical Manufacturers Assoc. v. Environmental Protection Agency,* 870 F.2d 177, 236 (5th Cir.1989), *cert. denied* 495 U.S. 910, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990); *Western Oil & Gas Assoc. v. Environmental Protection Agency,* 633 F.2d 803, 813 (9th Cir.1980). In determining whether an agency's action should be vacated or not pending rectification of a procedural flaw, the Court must consider (1) the purposes of the substantive statute under which the agency was acting, (2) the consequences of invalidating or enjoining the agency action, and (3) and potential prejudice to those who will be affected by maintaining the status quo. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402–03, 94 L.Ed.2d 542 (1987). In addition, the Court must consider the magnitude of the administrative error and how extensive and substantive it was.[4]

At the crux of this case is the question whether the *P.c.c.* gnatcatcher subspecies exists in such small numbers that the bird and its fragile habitat should receive federal protection under the Endangered Species Act. If the bird meets the criteria for listing, it should receive all the protection accorded under the Act. The release of Dr. Atwood's research data, and the public comments thereon will permit a more informed debate, and provide a more complete record on which the Secretary will make his final decision.

---

There is no guarantee that a court will become aware of matters that are relevant to a dispute unless the parties bring those matters to the court's attention. To paraphrase Judge Posner, judges are not like pigs, hunting for truffles buried in the administrative record. *See United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

4. It should be pointed out that there has been no substantive challenge to the Secretary's decision to list the *P.c.c.* This Court has only credited plaintiffs' complaint about deficiencies in the process.

From the release of Dr. Atwood's data and the Secretary's evaluation of that data will come one of two outcomes: the bird will either be deemed threatened or not threatened.

The Director of the U.S. Fish and Wildlife Service is of the opinion that removal of the *P.c.c.* from the threatened list during the relatively short reevaluation period would destabilize a delicate structure of regulations and incentives, designed by State and Federal officials to protect not just the *P.c.c.*, but the entire coastal sage scrub habitat community. The Director argues persuasively that landowners fearful of an imminent relisting of the *P.c.c.* may well destroy the remaining coastal sage scrub habitat on their property, in order to preemptively free themselves from potential limits on development that may come if the bird is listed permanently.

By contrast, if the bird listing is continued during the review period and the *P.c.c.* is not entitled to listing and the Secretary so finds after an evaluation of Atwood's data, then the southern California building industry and plaintiff Transportation Corridor Agencies would be delayed for but 100 days in their economic development and transportation construction plans. While the Court does not minimize the cost of such a delay to the plaintiffs, such delay does not outweigh the potential harm to the public interest if the Secretary's eventual decision is to continue the bird on the threatened species list.

Both the Congress in writing the Endangered Species Act and the Supreme Court in interpreting the Act have emphasized the strong policy preference for protecting endangered species even when such protection may result in adverse economic consequences. *See Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (holding that the presence of an endangered three-inch fish was enough to halt, pursuant to the Endangered Species Act, completion of a $100 million dam). In the findings section of the Act itself, Congress explained why protection of threatened species is important:

The Congress finds and declares that—

(1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

(2) other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

(3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

(4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction. . . .

16 U.S.C. § 1531(a). In interpreting this Act, the Supreme Court has stated "examination of the language, history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tennessee Valley Authority,* 437 U.S. at 175, 98 S.Ct. at 2292.

In the instant case, of course, the initial decision to place the *P.c.c.* on the threatened species list was flawed due to procedural error. The Secretary has represented to the Court that he is rectifying that error. The only issue before the Court is whether the putatively threatened bird is entitled to protection while the Secretary reevaluates the listing in light of Atwood's data and the public comment thereon. The Court is impressed with the actions taken by the Secretary to conform his determination with this Court's prior decision. The Court believes that the Secretary's actions address the legitimate concerns raised by the plaintiffs and that the Secretary is well on his way toward completing his obligations under law. While this could and should have been done initially, it is being done now. In balancing the competing claims of injury, considering the underlying purposes of the statute at issue, as well as the public interest, and the fact that the listing of the *P.c.c.* was part of a larger scheme of interlinking Federal, state, and local efforts to protect a fragile ecosystem, the Court finds the equities weigh in favor of continued listing *P.c.c.* during the

review period. *See Amoco,* 480 U.S. at 542, 107 S.Ct. at 1402–03. The Court will amend its prior judgment to permit the continued listing of the *P.c.c.* pending the Secretary's final determination.

It must be emphasized that by leaving the Secretary's listing decision in place, the Court is not relieving the Secretary of his burden of conducting a fair notice and comment on the Atwood data without giving preference to the decision already made. *See Fertilizer Institute v. Environmental Protection Agency,* 935 F.2d 1303, 1312 (D.C.Cir.1991). The Court will retain jurisdiction to assure the additional review procedure will be in accordance with the law.

An appropriate order accompanies this opinion.

### ORDER

The Court has considered the federal defendants' motion for reconsideration or amendment, all opposition thereto, and heard argument by the parties. For the reasons stated in the foregoing memorandum opinion, it is hereby

ORDERED that this Court's prior order of May 2, 1994, setting aside the final rule listing the coastal California gnatcatcher as a threatened species is hereby amended as follows:

1) The Secretary shall conduct a new notice and comment procedure for the purpose of providing for public comment the data underlying the Atwood reports.

2) The final rule listing the gnatcatcher as threatened shall remain in place while the Secretary makes Atwood's data available for public comment and reviews the data and comments submitted thereon;

3) The Secretary shall publish in the *Federal Register* no later than one-hundred days following the *Federal Register* notice announcing the availability of the data, his determination whether the gnatcatcher listing should be revised or revoked in light of his review of the data and public comments thereon; and

4) This Court's order continuing the listing of the gnatcatcher shall remain in effect until the Secretary completes his new no-

tice and comment proceeding and issues his final finding with respect thereto in the *Federal Register,* or until such other time as this Court shall order;

And it is further

ORDERED that this Court shall retain jurisdiction in this matter and any of the parties may petition the Court for modification of this order for good cause.