**NATURAL RESOURCES DEFENSE COUNCIL et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF THE INTERIOR et al., Defendants.**

**Irvine Ranch Water District et al., Intervenor–Defendants.**

**No. CV 99–5246 SVW.**

United States District Court, C.D. California, Western Division.

June 11, 2002.

Michael D. Fitts, Greines Martin Stein & Richland, Joel R. Reynolds, Andrew Elsas Wetzler, David C. Mason, Natural Re-

sources Defense Council, Los Angeles, CA, for Plaintiffs.

Peter Hsiao, Morrison & Foerster, Los Angeles, CA, Jean E. Williams, U.S. Department of Justice, Environment & Natural Resources Division, James C. Kilbourne, Christiana P. Perry, Lisa Lynne Russell, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Defendants.

## ORDER GRANTING MOTION FOR VOLUNTARY REMAND

WILSON, District Judge.

### I. Introduction.

On December 10, 2001 the government moved for a voluntary remand of the critical habitat designations represented in the Final Determination of Critical Habitat for the Coastal California Gnatcatcher ("gnatcatcher"), 63 Fed.Reg. 63680 (Oct. 24, 2000), and in the Final Determination of Critical Habitat for the San Diego Fairy Shrimp ("fairy shrimp"), 65 Fed.Reg. 63438 (Oct. 23, 2000), for the purpose of allowing the Fish and Wildlife Service ("FWS") to revisit these determinations in accordance with the requirements of Section 4(b)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1533(b)(2). The plaintiffs challenge the gnatcatcher critical habitat rule in all three related-cases, while only the plaintiffs in *Buildings Industry Association of Southern California et al. v. Norton,* CV 01–7028 SVW (CTx) challenge the fairy shrimp critical habitat designation ("CHD").

The Natural Resources Defense Council and Dr. Elizabeth Brown (collectively "NRDC") oppose the motion for voluntary remand. Numerous intervenor-defendants and the related-case plaintiffs briefed the motions for voluntary remand and vacatur.[1] The Court heard argument on Janu-

---

1. The government defendants to this action, *Natural Resources Defense Council et al. v.*    *United States Department of the Interior et al.,*

ary 14 and February 25, 2002. Following that hearing the Court directed further briefing from the government and the NRDC on the proper status of the critical habitat rules during remand.

Having considered the argument and all papers filed in this matter, the Court hereby GRANTS the motion for voluntary remand according to the timetable set forth herein, and DENIES the motion to vacate the gnatcatcher and fairy shrimp critical habitat designations during remand. The Court STAYS the remainder of this and the related cases pending resolution of the remand.

## II. Background.

The coastal California gnatcatcher (*polioptila californica californica*) ("gnatcatcher") is a songbird unique to coastal southern California and northern Baja California, restricted to an area from Ventura and San Bernadino Counties, California, south to approximately El Rosario, Mexico. *See* "Final Determination of Critical Habitat for the Coastal California Gnatcatcher," 65 Fed.Reg. 63680 (Oct. 24, 2000). The gnatcatcher lives in coastal sagebrush.

The Fish and Wildlife Service (with all other government defendants, the "Service") published a final rule listing the gnatcatcher as threatened on March 30, 1993, but refused to designate critical habitat.[2] *See* "Determination of Threatened Status for the Coastal California Gnatcatcher," 58 Fed.Reg. 16742 (March 30, 1993). The Natural Resources Defense Council ("NRDC") challenged the Service's refusal.[3] In 1997 the Ninth Circuit agreed with the NRDC and remanded. On July 25, 1997 the district court, on remand, ordered the Service to designate critical habitat for the gnatcatcher. The Service failed to comply. On October 15, 1998 the NRDC moved to compel compliance with the court order, and on August 4, 1999 this court ordered the Service to publish a proposed critical habitat by October 4, 1999. The Service published a final rule designating critical habitat on October 24, 2000. The critical habitat includes nearly 515,000 acres in Southern California, roughly 83 percent of which is privately owned land.

On December 20, 2000 the NRDC amended its complaint to challenge the final gnatcatcher critical habitat designation as arbitrary and capricious for excluding various parcels of land—including all areas covered by incidental take permits issued in concert with California's Natural Community Conservation Program ("NCCP")—from the final critical habitat.[4]

CV 99–5246, include the Department of the Interior; the Secretary of the Interior; the Director of the United States Fish and Wildlife Service; the Regional Director of the United States Fish and Wildlife Service, Region One; and the United States Fish and Wildlife Service Field Supervisor, Carlsbad Field Office (collectively the "Service"). The intervenor-defendants in this action are the Irvine Ranch Water District; the Metropolitan Water District of Southern California; the Santiago County Water District; the Irvine Company; the California Department of Fish and Game; the County of Orange; and the San Diego Gas & Electric Co.

**2.** By "Service" the Court refers to all government defendants in the NRDC action. *See* note 1, *supra*.

**3.** The current action originated with this NRDC challenge to the Service's failure to designate critical habitat.

**4.** On October 19, 2001 the NRDC filed a motion for summary judgment, which it noticed for hearing on March 18, 2002. In light of the Court's granting the Service's intervening motion for voluntary remand, the Court VACATES the NRDC's motion for summary judgment as MOOT. The Service will reconsider its final rule designating gnatcatcher

At roughly the same time various developers filed suit challenging the gnatcatcher critical habitat designation as arbitrary and capricious for including too much land. The plaintiffs in these two related-cases, *Rancho Mission Viejo, L.L.C. v. Babbitt,* CV 01–8412 SVW (CTx) and *Building Industry Association of Southern California et al. v. Norton et al.,* CV 01–7028 SVW (CTx), filed briefs in response to the motions at issue here.

The San Diego Fairy Shrimp (*branchinecta sandiegoensis*) ("fairy shrimp") is a small aquatic crustacean restricted to vernal pools in coastal southern California and south to northwestern Baja California, Mexico.[5] *See* "Final Determination of Critical Habitat for the San Diego Fairy Shrimp," 65 Fed.Reg. 63438 (Oct. 23, 2000) ("Fairy Shrimp Final Rule").

The Service published a final rule listing the fairy shrimp as endangered on February 3, 1997. *See* 62 Fed.Reg. 4925 (1997).[6] The Service designated critical habitat on October 23, 2000. The fairy shrimp critical habitat encompasses roughly 15,000

acres of Southern California, ranging from Fairview Regional Park in Orange County to portions of Camp Pendleton, Carlsbad, San Marcos, Ramona, San Diego, and Chula Vista.[7]

On March 8, 2001 the Building Industry Association of Southern California ("BIASC") and several industry groups filed a first amended complaint for declaratory and injunctive relief in *Building Industry Association of Southern California et al. v. Norton,* CV 01–7028 SVW (CTx) ("*BIASC*"), a related-case in this action, challenging the final rules designating critical habitat for both the gnatcatcher and fairy shrimp as arbitrary and capricious.[8,9] On March 16, 2001 the NRDC moved to intervene as defendant in the District Court for the District of Columbia, and sought a change of venue to this court. The District of Columbia court granted the motions on July 3, 2001 and this court received transfer of *BIASC* on August 13, 2001.

Underlying these three actions are two large development projects planned on ex-

---

critical habitat on remand. If the NRDC disagrees with the subsequent final rule it will have to renew its challenge at that time.

5. Vernal pools are bodies that have water in them for only a portion of any given year.

6. The Service initially failed to designate critical habitat for the fairy shrimp on grounds that such designation was not prudent. On October 14, 1998 the Southwest Center for Biological Diversity filed suit in the District Court for the Southern District of California to compel the Service to designate critical habitat. The court ordered the Service to publish a proposed designation by February 29, 2000. The Service published a proposed rule on March 8, 2000 and the final rule on October 23, 2000.

7. Of this area the Service claims that 45 acres are of unknown species occupancy, while the

remaining area is occupied. *See* 65 Fed.Reg. 63438.

8. The other plaintiffs are the Building Industry Legal Defense Foundation; the Foothill/Eastern Transportation Corridor Agency ("TCA"); the National Association of Home Builders ("NAHB"); the Forest Lawn Memorial–Park Association; the California Building Industry Association; and the Building Industry Association of San Diego County (collectively "BIASC plaintiffs").

9. The *BIASC* plaintiffs allege that the fairy shrimp final rule is based on a defective economic impact analysis, indiscriminately designates lands that do not qualify as critical habitat, and failed to rely upon best available scientific data. *See BIASC* First Amended Complaint ¶ 67.

isting gnatcatcher critical habitat. One is a four lane tollroad that the Eastern/Foothill Transportation Corridor Agencies ("TCA")—a plaintiff in *BIASC*—proposes to build through the center of a large swath of current gnatcatcher critical habitat. The second is a general plan by the related-case plaintiff Rancho Mission Viejo for housing and urban development in a large section of current gnatcatcher critical habitat.

The TCA commissioned an economist, Dr. Joseph T. Janczyk, to estimate the economic impact of the proposed gnatcatcher critical habitat. On July 31, 2000 Dr. Janczyk submitted his analysis of the economic impact on the "Southern California Market Region." He estimated that over a twenty year period, from 2000 to 2020, the gnatcatcher critical habitat would cause a potential "loss" of 5.6% of total estimated job growth, based on census growth in tracts with some overlap in the proposed critical habitat.[10] Restricting his estimate of the impact on job creation to census tracts entirely within the proposed critical habitat, Dr. Janczyk estimated a "loss" of 2.2% of total job creation over the twenty year interval. Projecting an increase of 3,464,291 new jobs over the entire twenty year interval, the impact of the proposed gnatcatcher habitat amounts to between 175,933 (5.6%) and 68,382 (2.2%) fewer new jobs.

Applying the same analysis to projected housing growth in the same region over the same twenty year interval, Dr. Janc-zyk estimated the impact of the gnatcatcher critical habitat designation as a "loss" of 8.5% of the estimated growth in new housing units when considering all census tracts with some portion within the proposed habitat, and a "loss" of 3.6% of the estimated growth when considering only census tracts located entirely within the critical habitat.[11] Projecting an increase of 2,184,542 new housing units over the entire twenty year interval, the impact of the proposed gnatcatcher habitat amounts to between 159,659 (8.5%) or 68,708 (3.6%) fewer new housing units.

Relying on these numbers Dr. Janczyk estimated an economic cost of the projected slower job and housing growth over the twenty year period at between $0.4 and $5.5 billion.

## III. Analysis.

Once the government lists a species as endangered or threatened under the ESA, the statute requires the government to designate a critical habitat "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3). The government must base the critical habitat designation on "the best scientific data available ... after taking into consideration the economic impact, and any other relevant impact, of specifying a particular area as critical habitat." 16 U.S.C. § 1533(b)(2).

The government long estimated the economic impact of designating critical habitat under section 4(b)(2) of the ESA, 16 U.S.C.

10. The analysis estimates growth in new jobs and housing units in the absence of the proposed critical habitat, as against growth in the presence of the critical habitat designation.

11. Dr. Janczyk included in the analysis an estimate of the economic impact of the then-proposed fairy shrimp critical habitat designation. The impact or loss to projected job growth for the same economic region over the same period was 14.4 times smaller than that estimated for the gnatcatcher habitat. Likewise, the impact on housing units was 57.6 times smaller.

§ 1533(b)(2), by a "baseline approach." [12] On May 11, 2001 the Tenth Circuit issued an opinion invalidating this approach to economic impact analysis. [13]

In light of that ruling the government now seeks a voluntary remand in order to reconsider the economic impact of designating gnatcatcher and fairy shrimp critical habitat. The motion for remand raises three issues: 1) the propriety of voluntary remand of these two rules; 2) the duration of a remand; and 3) the status of the rules during the remand period. The Court addresses each in turn.

**A. Voluntary remand of the gnatcatcher and fairy shrimp critical habitat designations to the Service is proper.**

**1. The court has authority to grant voluntary remand.**

■ The Court has equitable power to remand these critical habitats to the Service for reconsideration. "The jurisdiction to review the orders [of an agency] is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial actions. The purpose of the judicial review is consonant with that of the administrative proceeding—to secure a just result with a minimum of technical requirements." *Ford Motor Co. v. National Labor Relations Board,* 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939).

Voluntary remand is consistent with the principle that "[a]dministrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider." *Trujillo v. General Electric Co.,* 621 F.2d 1084, 1086 (10th Cir.1980). *See also Lute v. Singer Co.,* 678 F.2d 844, 846 (9th Cir.1982) (discussing *Trujillo* ). Voluntary remand also promotes judicial economy by allowing the relevant agency to reconsider and rectify an erroneous decision without further expenditure of judicial resources. *See, e.g., Ethyl Corp. v. Browner,* 989 F.2d 522, 524 (D.C.Cir.1993)(granting EPA's opposed motion for voluntary remand)("We commonly grant such motions [for voluntary remand], preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete."); *id.* at 524 n. 3 (collecting cases); *cf. Marathon Oil v. EPA,* 564 F.2d 1253, 1268–69 (9th Cir.1977) (discussing motion for voluntary remand).

**2. The Court agrees with the Tenth Circuit view of the economic impact analysis when designating critical habitat under ESA section 4(b)(2), 16 U.S.C. § 1533(b)(2).**

■ Where the administrative record of an agency action does not support the action, the proper course is to remand the decision to the agency. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *National Wildlife Federation v. Burford,* 871 F.2d 849, 855 (9th Cir.1989). This is such a case.

The government argues that remand of the gnatcatcher and fairy shrimp critical

---

**12.** The baseline approach excludes from consideration the economic consequences directly attributable to listing a species, focusing instead only on the marginal impact of designating critical habitat.

**13.** *New Mexico Cattle Growers Association et al. v. United States Fish and Wildlife Service et al.,* 248 F.3d 1277 (10th Cir.2001).

habitats is necessary to reconsider the designations in light of the recent Tenth Circuit interpretation of economic impact in 16 U.S.C. § 1533(b)(2). *See New Mexico Cattle Growers Association et al. v. United States Fish & Wildlife Service et al.*, 248 F.3d 1277, 1285 (10th Cir.2001) ("[W]e conclude Congress intended that the [Fish and Wildlife Service] conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable coextensively to other causes. Thus, we hold the baseline approach to economic analysis is not in accord with the language or intent of the ESA."). It is undisputed that the Service relied upon a baseline approach to the economic impact analysis in designating both the gnatcatcher and fairy shrimp critical habitats.

The NRDC opposes the voluntary remand on grounds that *New Mexico Cattle Growers* was wrongly decided. Although the plaintiff is correct that the Ninth Circuit has not directly spoken on the proper scope or method of the economic impact analysis in 16 U.S.C. § 1533(b)(2), the Court finds the analysis in *New Mexico Cattle Growers* persuasive.[14] Accordingly, the Court grants the motion for voluntary remand in order for the Service to reconsider both of the gnatcatcher and fairy shrimp critical habitat designations challenged in this and the related actions.

### 3. Limits on remand period.

The government seeks nearly two years (720 days) from October 1, 2002 to complete its reconsideration of the gnatcatcher critical habitat, and 720 days from April 1, 2003 to complete its reconsideration of the fairy shrimp critical habitat. *See* December 5, 2001 Gary Frazer Decl. ¶¶ 25–27. The government calculates this period by allocating 270 days for drafting new critical habitat proposed rules and gathering data; 90 days for review and publication in the Federal Register; 60 days for public comment; 30 days for the notice of availability of economic analysis and public comment on economic analysis; 180 days to collate public comments; and 90 days for review and clearance of final recommendation, and publication of the final rule. *Id.* at ¶ 25. Moreover, the government claims that it cannot begin the process until October 1, 2002 for the gnatcatcher, and April 1, 2003 for the fairy shrimp, "[b]ecause of our legal obligations to comply with pre-existing court orders and settlement agreements." *Id.* at ¶ 26. As such, the government proposes publishing proposed habitats in October 2003 (gnatcatcher) and April 2004 (fairy shrimp), with final rules by October 2004 (gnatcatcher) and April 2005 (fairy shrimp).

The NRDC proposes that the Court give the Service thirty (30) days to complete its

---

**14.** In *Douglas County v. Babbitt et al.*, 48 F.3d 1495, 1502–03 (9th Cir.1995), the Ninth Circuit held that the National Economic Policy Act's ("NEPA") economic impact statement requirement does not apply to critical habitat designation under the ESA. The Ninth Circuit observed that "[t]he legislative history of the ESA at issue ... convinces us that Congress intended that the ESA procedures for designating a critical habitat replace the NEPA requirements." *Douglas County*, 48 F.3d at 1503.

The Tenth Circuit characterizes *Douglas County* as standing for the broader proposition that no actual economic impact flows strictly from the act of designating critical habitat, which is the premise underlying the Service's baseline economic analysis for § 1533(b)(2). *See New Mexico Cattle Growers*, 248 F.3d at 1284, citing *Catron County Board of Commissioners v. United States Fish & Wildlife Service*, 75 F.3d 1429, 1436 (10th Cir.1996) (distinguishing *Douglas County*). This Court does not read the holding in *Douglas County* so broadly, nor does it find *Douglas County* inconsistent with the analysis in *New Mexico Cattle Growers*.

review and publish proposed critical habitats. The plaintiffs correctly observe that on August 4, 1999 the Court provided the Service with only sixty (60) days in which to comply with the earlier court order to designate gnatcatcher critical habitat.

■ In light of the statutory requirement for the government to account for the best scientific data and economic impact when designating critical habitat, 16 U.S.C. § 1533(b)(2), and the importance of conducting a meaningful notice and comment period, the Court orders that the government publish its proposed critical habitat designations for both the gnatcatcher and fairy shrimp within ten (10) months of the date of this order.

The Court stays this and the related actions pending resolution of the voluntary remand to the Service.

**B. The current gnatcatcher and fairy shrimp critical habitat designations shall remain in force during remand.**

**1. The Court has equitable power to enforce the rules during remand.**

The courts generally set aside an agency rule that a court finds arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2) (Administrative Procedures Act)("APA"); *Tinoqui–Chalola Council of Kitanemuk and Yowlumne Tejon Indians et al. v. United States Department of Energy et al.*, 232 F.3d 1300, 1305 (9th Cir.2000).

■ However, it is well-settled that when equity demands the court may enforce a rule promulgated contrary to the APA while the rule is remanded to an agency for further proceedings. *See Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir.1995) ("Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid. [ ] However, when equity demands, the regulation can be left in place while the agency follows the necessary procedures."), citing *Western Oil and Gas v. EPA*, 633 F.2d 803, 813 (9th Cir.1980); *see also ICORE, Inc. v. Federal Communications Commission*, 985 F.2d 1075, 1081 (D.C.Cir.1993) (collecting cases remanding a rule to agency without vacating). Although in granting the defendant's motion for voluntary remand the Court does not actually rule on the merits of defects in the economic impact analysis underlying these two critical habitat designations, the same equitable analysis for vacatur of the rules during remand should apply here.

The test for whether to remand an arbitrary and capricious rule without vacating depends in part on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *International Union, United Mine Workers v. Federal Mine Safety & Health Administration*, 920 F.2d 960, 967 (D.C.Cir. 1990); *see also United Mine Workers of America v. Dole*, 870 F.2d 662, 673 (D.C.Cir.1989) ("In deciding [whether to vacate a rule during remand] we consider both the seriousness of the deficiencies in the completed rulemaking and the doubts the deficiencies raise about whether the agency chose properly from the various alternatives open to it in light of statutory objectives.").

Both *Idaho Farm Bureau* and *Western Oil* involved challenges to rulemaking under environmental statutes. In that context the Ninth Circuit expressed special

concern for the potentially one-sided and irreversible consequences of environmental damage prompted by vacating defective rules during remand.

> Our hesitancy [to vacate the defective rule] springs from a desire to avoid thwarting in an unnecessary way the operation of the Clean Air Act in the State of California during the time the deliberative process is reenacted. We are also influenced by the possibility of undesirable consequences which we cannot now predict that might result from invalidation of the designations. Our intervention into the process of environmental regulation, a process of great complexity, should be accomplished with as little intrusiveness as feasible.

*Western Oil*, 633 F.2d at 813; *see also Idaho Farm Bureau*, 58 F.3d at 1405 ("In the present case, concern exists regarding the potential extinction of an animal species.").

In an earlier published decision involving one related-case plaintiff here, the District Court in the District of Columbia refused to vacate the original listing of the gnatcatcher despite a procedural flaw in the listing.[15] *See Endangered Species Committee of the Building Industry Association of Southern California et al. v. Babbitt*, 852 F.Supp. 32, 41 (D.D.C.1994) (Sporkin, J.).[16] Judge Sporkin identified the factors controlling the equitable decision to vacate or retain the defective rule during remand as: 1) the purposes of the substantive statute under which the agency was acting; 2) the consequences of invalidating or enjoining the agency action; 3) potential prejudice to those who will be affected by maintaining the status quo; and 4) "the magnitude of the administrative error and how extensive and substantive it was," *id.* at 41.[17]

**a. Substantive defects do not require vacatur.**

■ The procedural or substantive nature of the error causing a rule to violate the APA does not itself limit the court's equitable powers to enforce a regulation during a remand period. While the government correctly points out that the Ninth Circuit decisions refusing to vacate a defective rule during a remand involved procedural errors in agency rulemaking, *see Idaho Farm Bureau*, 58 F.3d at 1401–03 (notice and comment defects); *Western Oil*, 633 F.2d at 813 (same), the rationales

---

**15.** The plaintiff challenged the gnatcatcher listing as arbitrary and capricious based in part upon the Service's failure to publically disclose the raw scientific data upon which it relied in the listing determination. The court agreed that this omission rendered the listing arbitrary and capricious. *Endangered Species Committee of the Building Industry Association of Southern California et al. v. Babbitt*, 852 F.Supp. 32, 36–38 (D.D.C.1994).

**16.** BIASC is a plaintiff in *Building Industry Association of Southern California et al. v. Babbitt*, CV 01–7028 SVW (CTx) ("*BIASC*"), a related-case in this action. In *BIASC* the plaintiffs challenge the final rules designating critical habitat for both the gnatcatcher and fairy shrimp as arbitrary and capricious. On March 16, 2001 the NRDC moved to intervene as defendant in the District Court for the

District of Columbia, and sought a change of venue to this court. The District of Columbia court granted the motions on July 3, 2001 and this court received transfer of *BIASC* on August 13, 2001.

**17.** More recently, equitable considerations for vacatur of a critical habitat designation with the same defect in economic impact analysis presented here were addressed by Judge Bolton in the District Court for the District of Arizona. *See National Association of Home Builders et al. v. Norton et al.*, 2001 WL 1876349 (D.Ariz. 2001)(considering equitable factors for enforcing a critical habitat designation for the cactus ferruginous pygmy-owl during remand), at exh. 1 to the government's Supp. Memo. in Support of Vacatur.

of those cases and the language in the D.C. Circuit cases are not limited to procedural errors. Indeed, Judge Sporkin identified the substantive nature of the error as merely one of four considerations for vacatur. *See Endangered Species Committee,* 852 F.Supp. at 41; *see also National Association of Home Builders et al. v. Norton,* No. 00–CV–903, 2001 WL 1876349 at *5 (D.Ariz. Sept. 21, 2001)(considering equitable factors for enforcing critical habitat designation during remand to remedy same defective economic impact analysis at issue here), at exh. 1 to the government's Supp. Memo. in Support of Vacatur.

■ The consequence of a substantive rather than procedural error on the equitable balancing derives from a potentially greater likelihood of significant change to the existing rule during remand. The substantive character of a rulemaking deficiency suggests in general that an agency will revise the rule during reconsideration. Where the existing rule is more likely to fall during remand, the courts are more reluctant to enforce that rule in the intervening remand period. However, as illustrated by this case the fact dependent inquiry into the foreseeable consequences of the agency error prevents a *per se* rule of vacatur for substantive error.

**b. The substantive defect in these designations does not require vacatur of either critical habitat rule.**

There is no doubt that the Fish and Wildlife Service's failure to perform a proper economic impact analysis in compliance with section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), for the current gnatcatcher and fairy shrimp critical habitats, was substantive error under *New Mexico Cattle Growers.*

Nonetheless, it is unclear whether and how a proper economic impact analysis will affect the final designation of new critical habitat, or more particularly how such habitat will vary from the current designations. This Court is not in a position to predict what the new formulation will be when the proper criteria are considered.

**2. The risk of harm to either species from vacating the respective critical habitat designations outweighs the considerations favoring vacatur.**

■ The equitable analysis must focus on the potential disruptive consequences of vacating the current gnatcatcher and fairy shrimp critical habitat designations during remand, in light of the purposes underlying the ESA. As suggested by both Judge Sporkin and Judge Bolton, the inquiry turns on the foreseeable risk of harm to both the gnatcatcher and fairy shrimp during the remand period in the absence of the current critical habitat designations.[18] Contrary to the government's assertion, the balance favors retaining the current

---

18. In *National Association of Home Builders v. Norton,* 2001 WL 1876349 (D.Ariz. 2001), Judge Bolton based her equitable analysis on whether 1) evidence suggested that significant harm to the listed species was likely to occur if the CHD were vacated during remand; 2) whether the majority of land covered by the CHD was privately held and could be developed during the remand; 3) whether evidence suggested that development was actually planned; and 4) whether such development on privately held land was likely to cause significant harm to the listed species.

Although the Court agrees with Judge Bolton's effort to draw out evidence of a risk of an actual or impending habitat conversion, the focus on the potential for developing privately held land is not strictly on point unless private ownership merely stands for the proposition that the government lacks control to agree to a standstill pending remand. Unlike the section 9 take prohibition, the critical

rules during remand.[19]

### a. Statutory intent.

The ESA plainly states that its purpose "is to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species...." 16 U.S.C. § 1531(b). "[It is] the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. § 1531(c)(1). These policies are predicated upon an express finding that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531(a)(1). In 1978 the Supreme Court held that "examination of the language,

history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tennessee Valley Authority v. Hill et al.,* 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 (1978); *also Strahan v. Coxe,* 127 F.3d 155, 161 (1st Cir.1997) (discussing *TVA* ).[20]

The strong public policy in favor of environmental protection indicates that the Court should resolve uncertainties in estimating the risk of harm from habitat conversion during remand, in the absence of viable critical habitat designations, in favor of retaining the disputed rules. *See TVA; Idaho Farm Bureau; cf. Western Oil* (discussing general policy concerns attendant vacatur under environmental statutes, in context of the Clean Air Act).[21]

### b. Potential prejudice from maintaining the status quo.

The prejudice from maintaining the status quo is ill-defined. The *BIASC* related-

---

habitat designation only imposes section 7 federal agency consultation for actions with a federal nexus. *See, e.g.,* 16 U.S.C. § 1536(a)(2); *generally* Stanford Environmental Law Society Handbook, The Endangered Species Act 59 (2001) ("[C]ritical habitat provisions apply only to federal or federally authorized activities. Critical habitat designation can affect private land, but only to the extent that a future activity on that land is subject to federal permitting, for instance, filling wetland ....").

**19.** The government argues that "[g]iven the possibility of serious deficiencies in the rulemaking and the possibility that, as a result, the agency may have failed to give full effect to Congressional intent, the scales tip heavily in favor of vacating the existing critical habitat designations." Government Supp. Mem. in Support of Vacatur at 3. As explained above, the Court takes a different view of the import of the substantive error and the underlying Congressional intent. Moreover, the government omits the potential impact on the species from its balancing.

**20.** The Court recognizes that the decision to freeze construction of the Tellico Dam in *TVA* in order to protect the endangered snail darter prompted the statutory amendment to section 4 so as to require consideration of economic impact when designating critical habitat. *E.g.,* 16 U.S.C. § 1533(b)(2). The qualification does not disturb the underlying policy of the statute to advance environmental protection. 16 U.S.C. § 1531.

**21.** The differences in character between the potential harm to the listed species and the disruption to the defendant-intervenors and related plaintiffs enforces this presumption. Habitat loss may be irreversible and have unpredictable consequences for the survival or recovery of listed species. *Cf. Western Oil.* The burden on private developers from retaining the current CHDs are a mix of administrative transaction costs, uncertainty and delay in various land use projects pending the outcome of the remand.

case plaintiffs offer striking estimates of economic costs over a twenty year interval based on dampened growth in new jobs and housing units due to the gnatcatcher, and fairy shrimp, critical habitats.[22] However, the costs of retaining the habitats during remand is a much narrower issue. The remand will last a limited period that is far shorter than the twenty years for which Dr. Janczyk estimated economic impact.[23] For the set of developers planning projects with a federal nexus, the costs of retaining the current rules includes the administrative costs of compliance, or the costs of delay pending agency consultation

under section 7(a)(2).[24] If the government is correct in its assertion that the incidence of consultations will not vary regardless of whether the critical habitat remains, then no party will suffer additional burden from retaining the current rules.[25]

**c. On these facts the critical habitat designations provide a marginal benefit in reducing the risk of harm to the two species from habitat conversion.**

**1. Section 7 consultations.**

The sole function of a critical habitat designation under the ESA statutory scheme is to provide an additional agency

---

**22.** Dr. Janczyk's estimates of the economic impact of the proposed fairy shrimp critical habitat as of July 2000 are *de minimis* in relation to the gnatcatcher estimates. *See* note 10 *supra*.

**23.** Nor is it clear from the Janczyk analysis provided by the *BIASC* plaintiffs, exh. 1 to January 24, 2002 Robert D. Thorton Decl., whether the economic impact of the critical habitat designations is greater in the beginning or end of the twenty year interval over which he makes his estimates.

Moreover, Dr. Janczyk included in his analysis the impact on construction projects that were "currently planned" in July 2000, prior to the adoption of the final rules for the gnatcatcher and fairy shrimp critical habitat. The plans and expectations associated with those plans must now have adjusted to the intervening fact of the final habitat designations. If the plans remain then the developers have made a choice to go forward—though burdened with environmental regulation, and if so these projects will not be among those "lost" through reduced growth over the twenty year interval. If the developers abandoned such plans after the habitat designations, then enforcing the habitats during remand will not increase the total "lost" growth represented by those plans.

The immediate "cost" of retaining the critical habitats during remand appears to be an opportunity cost—namely, economic development could proceed more rapidly if the critical habitats were vacated. At worst, if the

rules are ultimately withdrawn then the cost of retaining them during remand is delayed growth. Of course, since developers must account for their expectation as regards the result of the Service's reconsideration of the critical habitats, the cost of retaining the rules during remand is reduced. Moreover, as the defendants and related-case plaintiffs point out, other environmental regulations remain in effect and affect development in the same habitat areas.

**24.** There are no estimates of these costs. Dr. Janczyk's analysis is a macroeconomic forecast attempting to isolate the long-run impact of imposing the current critical habitat designations. Certainly the expectations of the affected parties included accounting for such delay and administrative costs, prior to this court's granting the motion for voluntary remand.

To the extent that the defendants and related-case plaintiffs claim prejudice on the basis of *long-run* economic impact from the current habitat designations, that is precisely the issue that the Service must consider when it reviews the habitats on remand. That substantive issue is not before the court. In any event, the expertise for this economic impact analysis remains with the Service.

**25.** If the government is incorrect in this claim, then the salutary effect of keeping the current critical habitat designations during remand only increases.

1148

consultation requirement under section 7 when federally funded or sanctioned actions may destroy or adversely modify critical habitat (the "adverse modification" limitation). Section 7 of the ESA provides:

Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded or carried out by such agency [ ] is *not likely to jeopardize the continued existence* of any endangered species or threatened species or result in *the destruction or adverse modification of habitat* of such species which is determined by the Secretary . . . to be

critical, unless such agency has been granted an exemption for such action. 16 U.S.C. § 1536(a)(2) (emphasis added).[26]

Recent case law clarifies that *adverse modification* has broader scope and application than the *jeopardy* limitation in ESA section 7. *See Sierra Club v. United States Fish & Wildlife Service et al.,* 245 F.3d 434, 443 (5th Cir.2001) (holding the Service's definition of destruction and adverse modification at 50 C.F.R. § 402.02 facially invalid).

In *Sierra Club,* the Fish and Wildlife Service and the National Marine Fisheries Service (the "Services") refused to designate critical habitat for the threatened Gulf sturgeon. The Services found that it

26. The NRDC mistakenly argues that the presence of a CHD enlarges the prohibition against "take" at section 9 of the ESA. Section 9 of the ESA makes it unlawful for any person to "take any [listed] species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" at section 3(19) as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" as used in the ESA's definition of "take" includes significant habitat modification or degradation that actually kills or injures wildlife. *See Babbitt v. Sweet Home Chapter of Communities for Great Oregon,* 515 U.S. 687, 707–09, 115 S.Ct. 2407, 2418, 132 L.Ed.2d 597 (1995) (upholding the regulatory definition of harm at 50 C.F.R. 17.3 (1994) for purposes of section 9 take).

The NRDC claims that the *Sweet Home* construction of "harm" relies upon designated habitat, thereby converting a critical habitat designation into broader protections under section 9. Justice Scalia, dissenting in *Sweet Home,* interpreted "habitat" in the FWS definition of "harm" at 50 C.F.R. § 17.3 as referring to critical habitat. *See Sweet Home,* 515 U.S. at 724–25, 115 S.Ct. 2407 (Scalia, J., dissenting) (arguing that by importing critical habitat into the take prohibition by means of this harm definition, the FWS made "the habitat-modification restriction in § 1536(a)(2)

[the section 7 consult triggered by adverse modification of critical habitat] almost wholly superfluous.").

Though Justice Scalia invoked 'habitat' and 'critical habitat' interchangeably, the terms are distinct. Moreover, the lower courts have not followed Justice Scalia's interpretation. In an action challenging the listing of various types of fairy shrimp as threatened and endangered, the reasoning in *Sweet Home* enabled the plaintiffs to establish prudential standing on grounds that the section 9 take prohibition regulated their ability to "significantly modify fairy shrimp habitat" as soon as the fairy shrimp were listed. *See Building Industry Association of Superior California v. Babbitt,* 979 F.Supp. 893, 901 (D.D.C.1997). Listing, not designation of critical habitat, was the predicate act creating standing.

In any event the definition of "harm" is limited to "acts which actually kill or injure wildlife." *See Sweet Home,* 515 U.S. at 691, 696 n. 9, 115 S.Ct. 2407 (citing 50 C.F.R. § 17.3 (1994)). Consequently, this section 9 limitation is narrower than the adverse modification limitation in section 7. The narrower reach of the take prohibition in section 9 underscores the importance of the section 7 consultations in limiting intrusions into all habitat that has been found necessary for species survival and recovery.

was "not prudent" to designate habitat on grounds that "designation would not provide additional benefit to the species beyond other statutory regimes and conservation programs in place." *Sierra Club*, 245 F.3d at 437.[27] The plaintiff challenged the refusal to designate critical habitat as arbitrary and capricious. The district court granted summary judgment for the defendants. The Fifth Circuit reversed.

The Services based their reasoning on the regulatory definitions of *jeopardy* and *adverse modification* at 50 C.F.R. § 402.02. The regulation defined the two standards in nearly identical terms.[28] The Services argued that the presence of a critical habitat provided no additional protections under ESA section 7(a)(2), because under the definitions at 50 C.F.R. § 402.02 the adverse modification limitation would never require a consultation that was not already required by the jeopardy limitation. The Fifth Circuit held that the Services defined adverse modification too narrowly. Instead of the regulatory definition, the court held that adverse modification requires *only* that an action may affect species *recovery* through alteration of critical habitat. *See Sierra Club*, 245 F.3d at 441–42 ("Requiring consultation only where an action affects the value of critical habitat to both the recovery *and* survival of a species imposes a higher

threshold than the statutory language permits."). Reviewing the language of section 7(a)(2), the court identified conservation rather than survival as the policy underlying the adverse modification limitation.

Under the *Sierra Club* construction of the adverse modification limitation in section 7(a)(2), the presence of a critical habitat designation triggers federal agency consultation when a proposed land use may threaten the conservation or recovery of the listed species. As such, consultation must occur sooner than if the Service applied the narrower jeopardy standard that requires threats to species survival. On the facts of this case, the distinction is significant.

The government nonetheless persists in arguing that "[e]ven in the absence of a critical habitat designation, the effects of an action on species' habitats are considered when the Service determines whether jeopardy is likely to occur." Government Supp. Mem. is Support of Vacatur at 7. This argument has no merit. *See Sierra Club*.

## 2. Section 7 consultations during remand.

### a. Gnatcatcher.

Two large projects in particular threaten gnatcatcher habitat conversion during

---

**27.** The government, related-case plaintiffs and defendant-intervenors make the same argument here in support of vacatur. *See, e.g.*, Government Supp. Mem. in Support of Vacatur at 5 ("The existing critical habitat designations for these two species do not offer protections significantly greater than those provided by the species listed status. Frazer Decl. ¶¶ 3, 16–20, 21, 24–25. As a general matter, the only added protection offered by critical habitat comes through ESA section 7(a)(2)'s prohibition against 'destruction or adverse modification' of critical habitat. ESA sections 9 and 10 provide protections for threatened and endangered species regardless of whether critical habitat has been designated.").

**28.** The regulation defined the *jeopardy* limitation as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of *both the survival and recovery* of a listed species in the wild." 50 C.F.R. § 402.02 (emphasis added).

It defined the *adverse modification* limitation as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for *both the survival and recovery* of a listed species." *Id.* (emphasis added).

remand: first, a four lane tollroad that the Eastern/Foothill Transportation Corridor Agencies ("TCA") proposes to build through a large swath of current gnatcatcher critical habitat; and second, Rancho Mission Viejo housing and urban development plans for a large section of current gnatcatcher critical habitat. The scope of these projects will require a federal nexus through funding or permitting. The projects threaten adverse modification of the gnatcatcher habitat. Under these conditions the adverse modification limitation in section 7 will provide additional security by requiring federal agencies to consider the potential affect of these projects on gnatcatcher conservation and recovery.

These two projects, though the largest, are not the only known development plans that threaten gnatcatcher habitat conversion. The NRDC identifies twenty-six (26) applications filed between May 21, 1997 and March 12, 2001 and published in the Federal Register for incidental take permits relating to the gnatcatcher under ESA section 10. *See* March 13, 2002, David C. Mason Decl.[29] The plurality of applications indicates that significant real development of gnatcatcher habitat is currently planned. From this evidence the Court infers that there is a real probability that other development plans requiring a federal nexus might occur during remand, which could trigger consultation under the adverse modification limitation of section 7.[30]

---

**29.** A quick sampling of the applications indicates that these are non-trivial development projects. *See, e.g.,* "Moorpark Highlands Habitat Conservation Plan, Ventura County, California," 67 Fed.Reg. 3731 (2002) (plan for "construction and occupation of 570 residential units and appurtenant infrastructure on a 445–acre site north of the City of Moorpark, Ventura County, California"); "Mission View Estates Habitat Conservation Plan and Environmental Assessment," 67 Fed.Reg. 1496 (2002) (planned "construction of the 65–unit Mission View Estates residential development on 28.9 acres in the City of Oceanside, San Diego County, California"); "Availability of an Environmental Assessment and an Application for an Incidental Take Permit for the Temecula Ridge Apartments and Temecula Village Development Projects in Riverside County," 66 Fed.Reg. 60219 (2001)(construction "of multi-family residential structures and associated commercial/retail space on a 44–acre infill site adjacent to Rancho California Road in the City of Temecula in southwestern Riverside County, California."). The applications widely vary in the scope of proposed habitat conversion, as well as in the scope of the relevant development projects.

**30.** the Court recognizes that the ESA sections 9 and 10 analysis proceeds along different lines than the section 7 adverse modification analysis. The development projects underlying the incidental take permit applications are not matters that would trigger section 7 consultation under *only* the adverse *modification limitation. As discussed in the text and note 26, supra,* the section 9 "take" restriction (and the section 10 exemption) has *narrower* criteria (though broader application) than the adverse modification limitation. The incidental take permit applications collected by the NRDC were prompted in part because the relevant habitat in each case was actually occupied, in which case the proposed development might cause the actual harm necessary to come within the section 9 "take" prohibition.

The section 10 requirement for the applicant to propose a habitat conservation program ("HCP") in support of the incidental take permit in effect requires the Service to review and approve conservation measures tailored to a particular development project. *See* 16 U.S.C. § 1539(a)(2)(A)(ii) (requiring a permit applicant to list "what steps the applicant will take to minimize and mitigate" the impact from incidental take). The Service's review and approval of these incidental take permits and corresponding HCPs might provide sufficient security against adverse modification of critical habitat. Under *Sierra Club,* however, section 7 would force the Service to consider the impact of habitat conversion on species conservation and recovery—in addition to harm within the meaning of section 9.

### b. Fairy shrimp.

The record on the threat to the fairy shrimp by habitat destruction from known and impending development plans during remand is unclear.[31] The First Amended Complaint ("FAC") in *BIASC* obscures the identification of development plans specifically threatening fairy shrimp habitat. Instead of delineating which *BIASC* plaintiffs own or plan development on land within the fairy shrimp critical habitat designation, the FAC collapses the gnatcatcher and fairy shrimp critical habitat designations together and merely alleges that "[t]he Final Rules will require the plaintiffs and/or their members to expend substantial additional resources to obtain new and additional approvals from the Service and other federal agencies . . . to conduct activities within the critical habitat designated by the Final Rules." FAC ¶ 14. The FAC only once expressly connects a plaintiff to the fairy shrimp critical habitat, alleging that the "members of the NAHB also include companies that own property in areas that include coastal California gnatcatcher or fairy shrimp critical habitat." FAC ¶ 24.

The Court is also concerned with projects that, unlike those identified by the NRDC, may go forward during remand without requiring application for incidental take permits under section 10—e.g., habitat conversion projects that fail the narrower criteria of section 9—or that fail the criteria for the section 7 jeopardy limitation. The salient feature of these projects is that the Court does not know of their current prevalence or existence. However, the Court recognizes the TCA tollroad, the Rancho Mission Viejo general plan, and the projects identified in the twenty-six incidental take permit applications—as well as the divergent scope of those projects—as circumstantial evidence that other developments which would come within the adverse modification analysis are likely to occur during remand. As previously discussed, the Court resolves the uncertainty in this matter in favor of environmental protection.

By virtue of the *BIASC* challenge to the fairy shrimp critical habitat designation the Court concludes that there are development plans by at least the BIASC plaintiffs, and probably NAHB in particular, that threaten destruction of fairy shrimp habitat.[32] The lengthy administrative record related to the final rule on fairy shrimp critical habitat includes several letters submitted during the notice and comment period for the listing, economic impact analysis and critical habitat designation. The letters both support and challenge the proposed final rule. The absence of an advocate on the side of the fairy shrimp leaves silent the relevant citations to the record.

Mere cursory review, however, discloses that there is significant threat to remaining fairy shrimp habitat from any future development. *See, e.g.,* Fairy Shrimp Final Rule, Status Summary, 65 Fed.Reg. 63438 ("The San Diego fairy shrimp has declined throughout its range and is known from only 25 vernal pool complexes in San Diego, Orange, and Los Angeles Counties and Baja California, Mexico. The loss of ver-

**31.** Although the NRDC joined *BIASC* as an intervenor-defendant, it has not briefed the specific threat to fairy shrimp habitat in the absence of the current critical habitat designation. The other parties to *BIASC* are aligned in a desire to vacate the fairy shrimp critical habitat during remand, and offer nothing by which to evaluate the potential threat of development on the endangered species. Neither the intervenor-defendants in this action, nor the related-case plaintiff Rancho Mission Viejo, contribute to this debate. The *BIASC* plaintiffs and the Service appear to be the only parties interested in the status of the fairy shrimp habitat during remand.

**32.** The administrative record is replete with aged technical articles describing general threats to fairy shrimp habitat—articles that support the listing determination.

nal pool habitat is estimated at 90–97 percent and the loss is nearly total in Los Angeles and Orange Counties. The species continues to be threatened by habitat fragmentation due to urban development and agriculture, off-road vehicle activity, overgrazing, invasion of exotic species, and alterations of vernal pool watersheds and hydrology."). Much like the endangered Bruneau Hot Springs snail in *Idaho Farm Bureau,* further habitat destruction threatens the fairy shrimp with extinction. Under these circumstances, the equitable factors weigh heavily against vacatur during remand. Neither the Service nor the *BIASC* plaintiffs, with generalized arguments against harm relying on the operation of remaining ESA sections, provide grounds to shift this equitable balance.

### c. Other consultation arguments.

The government further argues that given the consultation history relating to the gnatcatcher and fairy shrimp, the outcomes of section 7 consultations during remand would likely be the same regardless of whether a critical habitat were in place.[33] The Court finds this argument misplaced.

The consultation history is arguably not representative of the projects requiring consultation during remand. The set of historic consultations triggered under the adverse modification test but not the jeopardy test is probably under-inclusive in light of the government's unduly restrictive pre-*Sierra Club* definition of adverse modification. In addition, the set of actions considered under the adverse modification limitation is small given the short time period in which the current critical habitats have been in place. The matters considered during the consultation history are not necessarily representative of the actions that would require future consultation, particularly if current or future land developers expect changes to the existing critical habitat designations when tested against the proper economic impact analysis. In fact, an increase in reported incidental take applications under section 10 at least suggests impending development or other actions that may have a federal nexus and trigger consultation under the adverse modification standard during the remand period.

Finally, the government argues that ESA section 7(a)(4), 16 U.S.C. § 1536(a)(4), requires an agency to confer with the Service prior to action that threatens the destruction or adverse modification of *proposed* critical habitat.[34] Even if it were clear that the current critical habitat designations would have the status of proposed habitats under section 7(a)(4) if the Court were to vacate them during remand, the protections under this section fall short of the protections under section 7(a)(2). By its own terms ESA section 7(a)(4) provides fewer protections than consultation under the section 7(a)(2)

---

**33.** "Based upon its past consultation history, the Service anticipates that the outcomes of section 7 consultations for the gnatcatcher and fairy shrimp would be the same, regardless of whether critical habitat is in place. In other words, it is unlikely that the requirement to consult with the Service on a proposed project would be triggered solely by the presence of critical habitat." Government Supp. Mem. in Support of Vacatur at 7.

**34.** It is not at all clear that the current critical habitats would have the status of "proposed critical habitats" under ESA section 7(a)(4) during remand, if the Court were to vacate the rules. If not, this argument by the government is irrelevant. If so, then the rest of the analysis in the text applies.

adverse modification limitation.[35] The consultation and confer requirements in these two sections are not interchangeable. Even if the plain language did not expressly distinguish the protections under each section, which it does, the government's argument requires an odd statutory interpretation construing the provisions with equal scope. Moreover, it is unclear whether the current critical habitat designations would qualify as proposed critical habitat under section 7(a)(4) should the Court vacate the rules during remand. This argument provides the government no support for its request for vacatur.

The Court observes that the government's position is at best strange. If the government is in fact correct in its prediction that consultations during remand will 1) occur as frequently with the critical habitat designations as without; or 2) result in the same permissive outcomes for agency actions regardless of whether a critical habitat is designated, then the government, and land developers, suffer little harm by leaving the current habitat designations in effect during the remand. On the other hand, if the government is wrong, then enforcing the current critical habitats during remand serves the statutory purpose of interposing agency consultations between the government's commitment of resources to proposed actions and furthering the listed species recovery through habitat protection. The government argues that the probability of a sec-

tion 7 consultation during remand that limits agency action is small; it ignores the possibility that the impact on gnatcatcher or fairy shrimp habitat and recovery from a consultation that *does* limit government action may be significant. It is to guard against that possibility that the equities favor retaining the critical habitat designations during remand.

### 3. The import of the background protections.

The parties argue at length about the efficacy of gnatcatcher and fairy shrimp protections in place regardless of whether the two critical habitats remain viable. The argument focuses on the operation of ESA sections 9 and 10, various habitat conservation programs approved in conjunction with section 10 incidental take permits, together with special rules promulgated under section 4, and counterpart California state conservation measures. The gravamen of the government's position, and that of the industry intervenor-defendants and related-case plaintiffs, is that taken as a whole these programs provide enough gnatcatcher and fairy shrimp protections to mitigate any marginal risk of harm flowing from vacating the current critical habitats during remand.

This debate is a transparent rehash of the government's previously rejected arguments against originally designating these critical habitats.[36] While arguably the Court's equitable inquiry into the efficacy of these critical habitat protections reaches farther than the narrow legal question of

---

**35.** A section 7(a)(2) consultation triggers a restriction on "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measure which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). The statute expressly exempts a section 7(a)(4) conference from this restriction on

commitment of resources. *See* 16 U.S.C. § 1536(a)(4) ("This paragraph does not require a limitation on the commitment of resources described in subsection (d) of this section."). In short, by their plain language the two sections are not interchangeable.

**36.** If these critical habitat designations add no meaningful species protections yet impose a cost on land owners and society, then there

whether the Service satisfied the statutory exceptions to the requirement that the Secretary designate critical habitat after listing, it would present at best an odd result should the Court now credit arguments for vacatur that were previously rejected as a basis for withholding critical habitat designations. The Ninth Circuit—in this very case—specifically rejected the arguments that critical habitat designation for the gnatcatcher would "not appreciably benefit the species;" or that California Natural Communities Conservation Programs ("NCCP") may substitute for critical habitat designation under the ESA. *See NRDC v. U.S. Department of the Interior,* 113 F.3d 1121, 1125–26 (9th Cir.1997) (rejecting argument that critical habitat designation is only necessary where designation will protect a majority of the species habitat); *id.* at 1127 ("[T]he NCCP alternative cannot be viewed as a functional substitute for critical habitat designation.... The NCCP alternative ... is a purely voluntary program that applies only to non-federal land-use activities.").[37] Such a substantive analysis of the need for a critical habitat designation belongs in the first instance with the agency, which must formulate the habitat designation based upon both best available scientific data and

economic impact, *see* 16 U.S.C. § 1533(b)(2), and in the second instance with the courts directly reviewing a failure to designate through challenges under the Administrative Procedure Act.

In any event, this court lacks the Service's expertise for interpreting such evidence. The government's argument that increasing pair counts demonstrate that the gnatcatcher has recovered under administration of the background conservation measures is disputed and does not support vacating the gnatcatcher critical habitat. *See* March 13, 2002, Dr. Jonathan Atwood Decl. ¶¶ 3–5. This is neither the proper forum nor procedural stance in which to resolve this dispute. At the same time, it is undisputed that both the gnatcatcher and fairy shrimp remain listed as threatened and endangered species. If a measurable recovery of either species is in fact demonstrable, then the Service may so account for the population shift when it reviews the best scientific evidence in conjunction with its review of the current habitat designations.[38]

**a. Sections 9 and 10 do not replace section 7 consultations under adverse modification.**

The Court rejects the argument that the ESA section 9, 16 U.S.C. § 1538, take

---

is no point in designating the critical habitats for these species beyond blind compliance with the statutory dictates. Since in the current posture the Court does not test whether the Service satisfies a statutory exception to designation, the government and intervenor-defendants invite a sort of referendum on the efficacy and wisdom of designating critical habitat. The Court finds it unwise to join this debate in this setting.

**37.** There is no doubt that the California NCCP, as well as the approved Multi–Species Conservation Plans [MSCP] and HCPs, are comprehensive and coordinated environmental protection programs tailored in part to the gnatcatcher and fairy shrimp. Whether or not these programs are better designed or more effective environmental measures than

critical habitat designation under the ESA, the Court cannot ignore the Ninth Circuit's earlier holding in this case. *See NRDC v. U.S. Department of the Interior,* 113 F.3d at 1127 ("Neither the Act nor the implementing regulations sanctions nondesignation of habitat when designation would merely be less beneficial to the species than another type of protection."). The Ninth Circuit has settled that the NCCP is not fungible with critical habitat, and the Court must conclude that as a matter of law the critical habitat offers distinct protections required by the ESA.

**38.** The Court notes that the government specifically identified such a review of best available scientific evidence as a basis for its prolonged remand schedule.

prohibition is coextensive with, or broader than, the adverse modification limitation requiring consultation under section 7. *See* note 26, *supra* (discussing section 9 in relation to adverse modification under section 7). While section 9 applies in all circumstances rather than only in the presence of federal action, funding or a permit requirement, the criteria triggering the section 9 prohibition are more narrowly drawn than the section 7 consultation requirement. *See Sweet Home,* note 26, *supra.*

ESA section 10 authorizes the Secretary of the Interior to exempt a party from the section 9 take prohibition where, among other requirements, the Secretary determines that a proposed incidental taking "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. § 1539(a)(2)(B)(iv).[39] Although the government argues that habitat conservation plans ("HCP") approved under section 10

in this case should adequately address the needs of the gnatcatcher and fairy shrimp in the absence of critical habitat designations, the Court finds this argument unavailing. First, the narrower criteria under which an applicant must apply for an exemption to section 9 take prohibition means that some habitat conversion may occur without necessitating a section 10 exemption, and without necessitating coverage under existing habitat conservation plans. Where such projects have another federal nexus, the critical habitat designation could require consultation under section 7. Second, the existing habitat conservation plans cover land outside the current critical habitat designations.[40]

**b. The NCCP and section 4(d) special rules do not replace section 7 consultation for adverse modification.**

California runs a comprehensive habitat management program under the California Natural Communities Conservation Pro-

---

**39.** In order to qualify for an incidental take permit an applicant must submit a conservation plan (the HCP) that specifies 1) the impact likely to result from the proposed taking; 2) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps; 3) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and 4) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan. *See* 16 U.S.C. § 1539(a)(2)(A).

**40.** The government argues as a basis for the effectiveness of the section 10 HCPs that "the Service has determined that the San Diego Multi–Species Conservation Plan ["MSCP"] and Orange County Central–Coastal [HCPs] (both of which are also NCCP plans) have been so successful in 'contributing to the recovery' of the gnatcatcher, that critical habitat did not need to be designated for the areas in which these plans were in effect." Government Supp. Reply in Support of Vacatur at 6–

7, citing 65 Fed.Reg. 63689 (2000). In fact the Service *excluded* "four subareas of the southwestern San Diego County MSCP and the Orange County Central–Coastal HCP from the critical habitat designation" on the basis of the MSCP and HCP effectiveness. Govt. Supp. Reply at 11. The Service's exclusion of all lands covered by NCCP plans is one basis of this action, in which the NRDC challenges the current critical habitat designations as arbitrary and capricious.

The Court is not concerned with development in NCCP areas, but specifically with habitat conversion from developments *within the confines* of the existing critical habitat designations. The natural implication of the quoted language is that critical habitat was required in areas *not* covered by the MSCP or HCP. As discussed in the text, not every project that could trigger a consultation under adverse modification would also require an application for an incidental take permit under section 10. Consequently, the efficacy of existing HCPs does not explain away the benefit of retaining the current critical habitats.

gram. The program relies on cooperation between state, federal and local interests to develop local land use plans and regulations that conserve species, habitats and ecosystems. Several jurisdictions with gnatcatcher and fairy shrimp habitat have enrolled in the NCCP. All NCCP plans are approved HCP under ESA section 10.

For jurisdictions that are still developing NCCP plans, the Service promulgated an ESA section 4(d) special rule that caps the amount of coastal sage scrub gnatcatcher habitat that can be destroyed within the jurisdiction at 5% of existing levels.[41]

The government argues that both NCCP plans and the section 4(d) special rules provide adequate habitat protections in the absence of critical habitat designations. The Court finds both arguments unavailing. First, the Ninth Circuit already determined in this action that the NCCP is not fungible with critical habitat designation. As the Ninth Circuit observed, the NCCP participation is voluntary while the statutory consultation predicated on critical habitat is mandatory. Second, the section 4(d) special rule does not provide equivalent protections as the critical habitat designation. As with the NCCP, the special rule applies to jurisdictions voluntarily participating in the NCCP, which have not yet finalized their NCCP plans. In addition, the special rule capping coastal sagebrush conversion eliminates the particularized inquiry of a section 7 consultation. The analyses are not equivalent, and the 4(d) special rule protections are distinguishable from the critical habitat protections under section 7.

## IV. Conclusion.

The Service's motion for voluntary remand of the gnatcatcher and fairy shrimp critical habitat designations is GRANTED in light of the analysis of economic impact under 16 U.S.C. § 1533(b)(2) set forth by the Tenth Circuit in *New Mexico Cattle Growers*. The Court agrees that *New Mexico Cattle Growers* is correctly decided, and the Service must reconsider the economic impact of these two critical habitats in accordance with the Tenth Circuit's teachings.

The service has ten months from the date of this Order to publish a final determination of gnatcatcher and fairy shrimp critical habitat. The Service shall comply with all dictates of 16 U.S.C. § 1533(b)(2) in arriving at this new set of final rules.

Finally, the existing critical habitat designations shall remain in force during remand.

The Court STAYS this action, CV 99–5246 SVW, and the two related actions, CV 01–7028 SVW and CV 01–8412 SVW, pending resolution of this remand. The clerk is ordered to enter this order in each of these files.

IT SO ORDERED.

---

**41.** On December 10, 1993, the Service published a special rule under ESA section 4(d), 16 U.S.C. § 1533(d), providing an incidental take statement for areas in which local jurisdictions both enrolled in the relevant state conservation program, and are in the process of *developing* habitat conservation plans. *See* 58 Fed.Reg. 63088 (1993). This special rule established a regional conservation planning program for gnatcatcher habitat throughout Southern California in partnership with the NCCP. As the government explains, "Businesses and others who participate in the NCCP pledge land, funding, and other resources needed for species' conservation and management, and, in return, receive assurances that they will not be surprised by additional mitigation requirements down the road." Government Supp. Mem. in Support of Vacatur at 11.